NOT DESIGNATED FOR PUBLICATION

No. 118,574

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of S.L., J.L., and L.C.,
Minor Children.

MEMORANDUM OPINION

Appeal from Johnson District Court; KATHLEEN SLOAN, judge. Opinion filed June 15, 2018.
Affirmed.

*Richard P. Klein*, of Olathe, for appellant natural mother.

*Elizabeth A. Billinger*, assistant district attorney, and *Stephen M. Howe*, county attorney, for
appellee.

Before GARDNER, P.J., GREEN and SCHROEDER, JJ.

PER CURIAM:  The trial court terminated M.C.'s parental rights to her three minor
children, in part, due to her substance abuse and inability to obtain reasonable income and
a safe and drug-free home environment. The trial court made its decision under K.S.A.
2017 Supp. 38-2269(b)(7),(b)(8), and (c)(3). On appeal, M.C. argues that there was
insufficient evidence to support her conviction and the trial court abused its discretion by
finding the termination was in the best interests of the minor children. We find no error
and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

M.C. is the natural mother of four children, three of her children are the subjects of this appeal. The three children are six-year-old, L.C., four-year-old, S.L., and three-year-old, J.L. When the termination hearing occurred, the children were four, three, and two years of age, respectively. J.L. is the father of S.L and J.L. C.P. is the father of L.C. Both fathers relinquished their parental rights before trial and do not join M.C. in this appeal. A.V. is M.C.'s current husband. M.L. is the maternal grandmother to all three children at issue and was the children's temporary placement throughout the proceedings below.

The record does not list a middle initial for either J.L., the father, or J.L. the son. Any mention of J.L. throughout the remaining portion of this opinion is referring to J.L., the adult father.

When these proceedings first began in November 2015, M.C. was in jail for pending drug distribution charges. M.C. was released on bond on February 11, 2016, but her bond was revoked on June 3, 2016. M.C. was eventually convicted and sentenced to 37 months in prison and 24 months of postrelease supervision. M.C. was serving this sentence when the termination hearing started.

The State filed a petition and ex parte order of protective custody on November 20, 2015. The trial court removed the children from the home because of the parents' drug use and noncompliance with Kaw Valley Center (KVC) family preservation services. The trial court granted protective custody to the Department for Children and Families (DCF) and ordered a hearing on the matter. The temporary custody order was entered at the temporary custody hearing, and the parents of the three minor children were ordered to attend a parenting class, CINC 101.

2

On February 16, 2016, the trial court adjudicated all three children to be children in need of care (CINC) under K.S.A. 2017 Supp. 38-2202. The trial court found that the parents were using and selling drugs from their home. Moreover, the trial court further determined that several criminals invaded the home at gunpoint while the children were home. M.C. was incarcerated for a drug crime. Both parents admitted to their use of methamphetamine and marijuana. M.C. tested positive for methamphetamine. The trial court then proceeded directly to disposition and concluded that the disposition goal should be reintegration. The trial court further instructed that M.C. and J.L. be offered separate 120-day reintegration plans.

J.L. was incarcerated out of state and never meaningfully participated in the case or his reintegration plan.

The reintegration plan required the completion of typical tasks. Specifically, the plan required M.C. to obtain and maintain a suitable, drug-free home environment. The plan also required that M.C. obtain employment, take parenting classes, complete a mental health evaluation and participate in counseling accordingly, submit to random urinalysis assessments and follow the recommendations accordingly, abide by visitation rules and guidelines, including providing food and activities for the children during visitation. The reintegration plan further required that M.C. provide proof of completion of the above listed tasks and required M.C. to provide any necessary additional information.

After being released on bond, M.C. began working with DCF to complete her reintegration plan. On May 11, 2016, a review hearing was held to consider her reintegration progress. The trial court extended M.C.'s reintegration plan by 60 days to give her more time to make progress. Up to that point, roughly 76 days into her 120-day plan, M.C. had completed very few of her reintegration tasks. After M.C.'s bond was revoked, another review hearing was held on August 15, 2016. The trial court refused to

further extend the reintegration plan. The trial court ordered and scheduled a permanency hearing for November 14, 2016.

On November 11, 2016, the State moved to terminate the parents' parental rights. A termination hearing was held on April 3, 2017, to consider the termination of M.C.'s parental rights. By that time, M.C.'s three minor children had been placed in DCF custody for more than 15 months and M.C. had just begun her 37-month prison sentence.

The State called five witnesses, including Detective Carson Spegal, Stacy Brison-Bray, Laura Rose, Saarah Ahmad, and M.C. M.C. also testified on her own behalf but did not present additional witnesses. The trial court admitted 12 of the State's exhibits and 12 of M.C.'s exhibits.

Detective Spegal testified first. Detective Spegal responded to a report of aggravated robbery at M.C.'s then home on July 14, 2015. He testified that upon arriving at the scene, only M.C. and J.L. were present but M.C.'s children were in the home during the commission of the reported robbery. J.L. told Detective Spegal that four masked men, three of which were armed with firearms, entered and robbed the couple's apartment. The men proceeded to beat J.L. and removed M.C. from the shower and forced her to the ground. During this time M.C.'s three-month-old child was left in the living room with J.L.'s friend, Kimball. Kimball was suspected by J.L. and M.C. as being the person who planned the robbery. M.C. told Detective Spegal that "she had been around the drug game long enough to know what had happened [that night] regarding Mr. Kimball setting up the robbery." The robbers reportedly stole "a gaming system, two cell phones, an envelope that contained approximately $1,500 in cash, a tablet, [and] a metal cashbox." Detective Spegal located some but not all of those items in M.C.'s home.

After obtaining consent to search the apartment, Detective Spegal found marijuana, notes of sale of marijuana, and other marijuana-related paraphernalia.

4

Detective Spegal also found a needle and a syringe full of a clear liquid substance. Detective Spegal also testified that he found a pill bottle containing two different types of medications: alprazolam, a schedule III drug and amphetamine and dextroamphetamine, a schedule II drug. The medications were not prescribed to J.L. or M.C. Detective Spegal testified that he also located ammunition in M.C.'s bedroom, and $2,500 hidden in a baby bassinet.

Detective Spegal testified that M.C. indicated that she was not named on the lease of the apartment because she was a convicted felon. M.C. also told Detective Spegal that she and J.L. were being evicted from the apartment and were required to move within five days. M.C. also told Detective Spegal that she and J.L. had made trips to Colorado to buy and transport marijuana and returned from one of those trips the day of the robbery. Detective Spegal also testified that M.C. admitted to using methamphetamine and marijuana.

Brison-Bray, a DCF child protection specialist, testified next. Brison-Bray began investigating M.C. and her children in November 2015. After M.C. was jailed for her pending distribution charge, Brison-Bray visited M.C.'s children to determine whether they were receiving proper care. Brison-Bray testified that J.L. was caring for the children in M.C.'s absence. Brison-Bray testified that because J.L. was cooperative and living with M.C.'s parents for additional support with the children, she was willing to work with the family by putting family preservation services in the home. Nevertheless, after J.L. refused drug testing and failed to stay in contact with DCF services, Brison-Bray felt that further intervention was necessary and requested an ex parte order for protective custody. Brison-Bray testified that when the children were eventually removed from the home, they were "fairly disheveled. The infant was so dirty that he actually had to be bathed in the sink at the DCF office."

Brison-Bray contacted M.C. while she was in jail. Brison-Bray testified that M.C. claimed that she and J.L. were legally married. M.C. also admitted to having a history of drug use and that she had been clean for five and a half years but then relapsed. M.C. also admitted to being nine weeks pregnant with possible twins when she relapsed. M.C. told Brison-Bray that on the day she was taken into custody, M.C. took only her six-month-old baby with her. The other two children were left with her neighbor, but the baby accompanied her because "she thought the neighbor was slow." M.C. also told Brison-Bray that she thought it was one of her ex-boyfriends who broke into her home during the robbery. Brison-Bray testified that she was concerned the children lacked supervision because of the parents' substance abuse issues.

Rose, another DFC child specialist, testified that M.C. indicated that her husband, A.V. was sober and able to care for her infant child. Rose later found out that A.V., nevertheless, had pending criminal charges for selling methamphetamine. A.V. also admitted to Rose that his pending charges involved the possession of methamphetamine, a scale, baggies, and a glass pipe.

Ahmad was the State's next witness. Ahmad worked for KVC Behavioral HealthCare as a therapeutic case manager, providing reintegration services for families. Ahmad worked with M.C. in completing her reintegration plan and testified about M.C.'s progress in that plan. Ahmad testified that M.C. mostly failed to complete the terms of her reintegration plan.

First, Ahmad testified that M.C. did substantially comply with the visiting requirements but also exhibited concerning behaviors during those visits. Ahmad testified that M.C. contacted her to set up visits with her children, which Ahmad arranged. M.C. participated in 16 visits with her children before being imprisoned. Ahmad was concerned when M.C. did not have money to buy the children food. Ahmad testified that M.C. asked for money from the children's temporary placement to buy the children food

6

for six different visits. Ahmad explained that there were eight total visits that were held during a time when the children would need to be provided food. Thus, M.C. only provided the children with food for two of the eight meal-required visits.

Ahmad testified that M.C. never had a visit in the KVC room because they "prefer to have visits in the community to provide a more natural setting . . . for parents, as well as children." Ahmad explained that parents in reintegration plans do not typically start with community visits; they must progress to that point. J.L., nevertheless, had already made the requisite progress with the children, so KVC allowed M.C. to also participate in community visits without progressing to that point.

Ahmad testified that she was concerned with M.C.'s inability to focus on her children for her one-hour, weekly visits. M.C. was seen interacting with others who were not a part of her visit for 8 out of the 16 visits. Ahmad also testified that she was concerned for the children's safety because M.C. did not pay attention to her children while visiting them in a park. Ahmad testified that on five out of eight park visitations, M.C. was seen smoking up to two cigarettes during the one-hour visit. Also, M.C. was pregnant while smoking.

Ahmad testified that M.C. and J.L. attended some of the visits together. Ahmad eventually told the couple that they would have to participate in separate visits because of the court's no contact order between them. Ahmad testified that upon being told this, M.C. balled her fists and became physically angry.

Next, Ahmad testified that M.C failed to provide necessary housing, transportation, and employment documentation. In February, M.C. told Ahmad that she was living with a friend and her daughters but did not provide proof that she was living there or had the ability to live there. In March, M.C. claimed she was living with a friend in Edgerton but again failed to provide proof of that living situation. In June, M.C. told

7

Ahmad that she was planning on living with A.V. upon release from prison. Ahmad testified that she was concerned with M.C.'s living plan because of A.V.'s multiple convictions and drug abuse. Ahmad was also concerned with the short term of A.V. and M.C.'s marriage; the two had only been married for a few weeks before M.C. was sent to jail.

Ahmad testified that M.C. at least maintained a valid driver's license but did not provide KVC with proof of transportation.

Ahmad further testified that M.C. also failed to find employment and provide proof of it. M.C. told Ahmad she was unable to work due to pregnancy complications and stage III cervical cancer, requiring bedrest. M.C. later told Ahmad she was not cancerous but precancerous. Ahmad testified that she received M.C.'s medical records but they did not include an order to be on bedrest. After being sentenced to 37 months' imprisonment for drug distribution, M.C. told Ahmad that she would have a position waiting for her at Canyon Stone upon her release from prison but did not submit proof of that pending position.

Ahmad also testified that M.C. failed to provide budget forms, failed to obtain background checks of the persons living in her home, and failed to complete the CINC 101 parenting class as required by her reintegration plan. After being imprisoned, M.C. was given access to parenting classes and told Ahmad she planned on at least attending one of the offered classes. M.C., nevertheless, told Ahmad she could not participate in one of the prison's parenting classes due to a 2007 conviction for child endangerment.

Ahmad testified that the primary reason the children were removed from M.C.'s care was due to substance abuse problems in the home. M.C. failed to get any mental health treatment, including substance abuse treatment. While M.C. tested negative for drug use throughout the duration of her reintegration plan, she failed to provide proof of

8

involvement in substance counseling before or after being imprisoned. Related to her substance abuse problem, M.C.'s youngest child, though not a child involved in this case, is being monitored for special treatments because of the complications caused by M.C.'s use of illicit drugs during her pregnancy with that child.

While assisting M.C. with her reintegration plan, Ahmad attempted to help M.C. find permanent employment and other essentials. Ahmad requested funds to help M.C. start her own business. She also advised M.C. to seek help through her local churches. Ahmad also requested funds from KVC to provide M.C. with toddler beds and a crib.

Ahmad testified that the three children were placed together with their maternal grandmother. M.C.'s children had only seen M.C. once since June 2016. Ahmad was concerned with this gap of time and what the children were learning from having an absent mother. Ahmad, nevertheless, said the children's needs were being met since being in the care of their maternal grandmother.

Ahmad ultimately testified that M.C's parental rights should be terminated. Ahmad also testified that she did not think, given M.C.'s history, that she would be able to take the children back into her custody immediately after prison. Ahmad unequivocally felt that M.C.'s parental rights should be terminated so that the process of full adoption could be completed. Ahmad testified that she felt the children's maternal grandmother would be an appropriate place for permanency.

M.C. testified last. She testified that she was 27 years old and completed some college. She moved in with J.L. when she was 16 or 17 years old. M.C. testified that she began using methamphetamine when she was 13 years old and that she has struggled with substance abuse from then on. M.C. testified that she was sober for 5 years but was incarcerated for 2 of those years. M.C. explained that she relapsed in 2014 and started using, in part, due to her postpartem depression and J.L.'s use of the drug.

9

M.C. participated in a 21-day rehabilitation treatment in 2011, and went to detox on three or four separate occasions. She was last employed in early 2013 and has never obtained independent living where she was a named party on the property lease. M.C. admitted that she did not notify KVC of her relationship with A.V. but claimed she notified KVC that she was moving in with him after moving out of her friend's house.

M.C. testified about her convictions and periods of incarceration. She admitted that during her first prison stay, she accrued 53 write-ups but had only accrued 1 write-up during the sentence she was serving when the trial started. She was confident that she would not gain additional write-ups and would be released on her earliest possible release date. Her earliest release date was March 24, 2018.

M.C. testified that she struggled with taking care of her three children. She testified that her struggle stemmed from her drug abuse and unstable financial situation. Because of this struggle, M.C. testified that she knew she was not prepared to raise a fourth child. Before trial, M.C. signed a voluntary termination of her parental rights to her youngest child.

M.C. testified that since being in prison she has completed several classes and gained multiple certificates. M.C. participated in Microsoft programing classes, forklift training from Washburn Technical University, parenting classes, a dog training program, and was working with a volunteer to help develop a program for battered women. She felt that four of the prison programs she was participating in were aimed at helping her mental health issues and that two others were aimed at helping her to gain employment upon release from prison. M.C. further testified that she was on the waitlist to receive a new drug abuse assessment and was attending narcotics anonymous meetings three times per week.

10

M.C. testified that she maintains regular contact with her three children. She calls weekly and sends gifts and letters to them. M.C. admitted that she had only seen her children once since being incarcerated but maintained that her mother was committed to continuing to bring the children to visit her.

Upon release, M.C. told the court that she planned on living with A.V. and his parents. She testified that A.V. would allow her to use his car as a means of transportation. She testified that she knew a manager of a company who could give her a position as a forklift driver if she was successful in obtaining her forklift certification. If she did not obtain her forklift certification, she would work for Canyon Stone making latex molds.

M.C. testified that she would remain crime free once released from prison. She claimed that she was able to stay crime free for a significant amount of time after having children and that she was motivated to do so again. She maintained that she stopped associating with the bad influences in her life after her first crime. M.C. predicted that she would only need a month or two after being released from prison to complete all of her reintegration plan and, therefore, regain custody of her children.

M.C. testified that she loves her children and that they are bonded to her. She told the court that her children recognize her when they see her but have stopped crying when they are required to leave visitation with her.

The first time when M.C. was on postrelease supervision, she committed another felony. She, however, successfully completed her postrelease supervision the second time it was imposed. M.C. testified that she would no longer associate with J.L. due to his drug use and would not associate with another one of her ex-boyfriends because he was a drug dealer. M.C. described an event in which another one of her ex-boyfriends chased her and her then six-month-old child when she attempted to drive away from him. In an

attempt to stop her escape, M.C.'s ex-boyfriend shattered the driver's side window of her vehicle while her son was in the back seat of the car.

M.C. testified that she knew A.V. had a three-year-old conviction for possession of methamphetamine and a pending charge for selling methamphetamine. M.C., nevertheless maintained that A.V. no longer used drugs and never used drugs with M.C. M.C. also testified that her relationship with A.V. was acceptable because A.V. did not use drugs, despite pending charges for selling them.

At the close of evidence, the trial court took the matter under advisement. On September 15, 2017, the trial court issued its memorandum decision terminating M.C.'s parental rights to S.L., J.L., and L.C. The trial court found M.C. unfit under K.S.A. 2017 Supp. 38-2269(b)(7) based on the failure of reasonable efforts made to reintegrate the family; K.S.A. 2017 Supp. 38-2269(b)(8) based on M.C.'s failure to adjust her circumstances, conduct, and conditions to meet the needs of her children; and K.S.A. 2017 Supp. 38-2269(c)(3) based on M.C.'s failure to complete her reintegration plan. The trial court further found M.C.'s unfitness was unlikely to change in the foreseeable future; and it was in the children's best interests to terminate parental rights.

*Standard of Review*

A parent has a fundamental liberty interest in the relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Once a child has been adjudicated to be a CINC, parental rights may be terminated "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2017 Supp. 38-2269(a). K.S.A.

12

2017 Supp. 38-2269(a) imposes the burden of proof upon the State. See *Kramer*, 455 U.S. at 769-70.

When reviewing the trial court's termination of parental rights, we review the entirety of the record, in light most favorable to the State, and determine whether a rational fact-finder could have found that there was clear and convincing evidence to support the trial court's determination. In reviewing those findings, we do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re Adoption of B.B.M.*, 290 Kan. 236, 244, 224 P.3d 1168 (2010) (citing *In re B.D.-Y.*, 286 Kan. at 705.

K.S.A. 2017 Supp. 38-2269(b) lists several nonexclusive factors the trial court considers in making a determination of unfitness. If a child is not in the parent's physical custody, the court must also consider a separate list of nonexclusive factors when determining parental unfitness. K.S.A. 2017 Supp. 38-2269(c). A finding of "any one of the . . . factors standing alone may, but does not necessarily, establish grounds for termination of parental rights." K.S.A. 2017 Supp. 38-2269(f). We consider whether the trial court's termination of parental rights based on a finding of unfitness is in the best interestof the child. K.S.A. 2017 Supp. 38-2269(g)(1).

The trial court found M.C. unfit based on K.S.A. 2017 Supp. 38-2269(b)(7) and (b)(8). The statutes require consideration of the parents': "(7) failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family; (8) lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child." K.S.A 2017 Supp. 38-2269(b)(7)-(8). The trial court also found M.C. unfit due to her "failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home[,]" as required by K.S.A. 2017 Supp. 38-2269(c)(3).

13

Reviewing the evidence, the trial court stated:

"During the short window . . . that [M.C.] was not incarcerated, she failed to comply with the tasks on her reintegration plan such as turning in budgets and providing proof of housing, transportation or employment. She . . . provided no proof of initiation of or completion of the recommendations from [a psychological] evaluation to pursue substance abuse treatment and individual therapy. . . .

"[M.C.] has a long history of drug usage, relapse, unstable housing, being involved with unstable individuals, and unemployment. She will remain incarcerated for a significant period of time, and even once released she will need a significant amount of time to show stability before the children could be returned to her. [M.C.]'s prediction at trial that she needed only one to two months once released to prove stability (financial, housing, being drug-free) is unrealistic given her long history of instability."

Detective Spegal testified about an incident in which the children were victims of an armed robbery. Detective Spegal also testified that the children were living in a home in which M.C. and J.L. housed guns and ammunition, multiple illicit drugs, and drug paraphernalia. M.C.'s housing stability was also called into question when Detective Spegal testified that M.C. was being evicted from the apartment they were living in at that time.

Brison-Bray testified that the children needed to be removed from the home for several reasons. Additionally, Brison-Bray testified that upon removal from the home, the children were disheveled and the youngest child, J.L. "was so dirty he actually had to be bathed in the sink at the DCF office."

14

Rose testified about her concern regarding A.V.'s participation in the minor children's lives. M.C. knew about A.V.'s drug charges but failed to see why the criminal charges were relevant to the issue of her children's best interests.

Ahmad testified that M.C. failed to comply with most of the terms of her reintegration plan. M.C. failed to obtain and maintain appropriate housing and provide proof thereof. Ahmad also testified that M.C. failed to obtain employment, obtain background checks of people she lived with, complete CINC 101 parenting class, provide budgets, provide proof of transportation, and complete substance and mental health treatment. Moreover, Ahmad testified that M.C. exhibited poor parenting behavior while visiting her children.

DCF and KVC worked diligently with M.C. to assist M.C. in completing her reintegration plan. Although M.C. completed very little within the first three months of the 120-day reintegration plan, the trial court extended the plan by two months to give M.C. a greater chance for success. The reintegration plan failed even after DCF and KVC provided reasonable efforts in assisting M.C.'s success. While M.C. made some efforts to maintain a relationship with her children and complete some of her reintegration tasks, her efforts fell sufficiently short of the mark established for her.

Although the trial court did not make a specific finding in relation to M.C.'s imprisonment, it did consider M.C.'s imprisonment in its memorandum decision. Additionally, the trial court considered M.C.'s failure to comply with her reintegration plan while released on bond as an additional basis for finding M.C. unfit.

Next, M.C. argues that the trial court's finding regarding foreseeable future ignores the clear progress she had made before and after being incarcerated.

For parental rights to be terminated, the trial court must find that a parent's unfit conduct or condition was unlikely to change in the foreseeable future. See K.S.A. 2017 Supp. 38-2269(a). "Foreseeable future" is measured from the child's perspective, and takes into account a child's perception of time. *In re S.D.*, 41 Kan. App. 2d 780, 790, 204 P.3d 1182 (2009).

"This court has considered periods of time as short as seven months to be the foreseeable future from a child's perspective. 41 Kan. App. 2d at 790. A court may predict a parent's future unfitness based on his or her past history. *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982)." *In Interest of J.A.D.*, No. 117,693, 2018 WL 1885253, at *7 (Kan. App. 2018) (unpublished opinion).

In considering the foreseeable future, the trial court found:

"[M.C.] is incarcerated, her plan for housing upon release is concerning and there is no proof that her plan is possible or even viable. She claims to have a job waiting for her but there is no proof of that . . . She has a long history of involving herself with individuals who are not appropriate to be around children and is currently married to a man with a significant criminal background, including pending charge for distribution of methamphetamine (also [M.C.]'s drug of choice). Her plan to live with [A.V.] upon her release from prison . . . give this Court pause and concern for the future of the children with their mother and their success."

The record establishes that M.C. has and continues to struggle with substance abuse. She admitted to using methamphetamine since she was 13 years old and also admitted that she has relapsed on more than one occasion, including while pregnant. The record also shows that M.C. consistently involves herself with men who are violent, sell drugs, or use drugs. M.C. even planned to live with A.V. after her release from prison

regardless of his criminal convictions, including ones that involve using and selling drugs.

M.C. emphasizes that she did not fail any UAs during her reintegration plan and also completed several courses since being incarcerated. The State, however, is correct when it points out that M.C.'s drug use is an ongoing problem due to her choice not to appropriately address her abuse problems. Additionally, M.C.'s minimal progress made within weeks of the termination hearing was insufficient to show that she should retain her parental rights. The evidence shows that M.C.'s unfitness was unlikely to change within the foreseeable future.

Finally, M.C. argues that the trial court gave no consideration to the physical, mental, or emotional needs of the children and it was an abuse of discretion to find that termination was appropriate.

Having found M.C. unfit and unlikely to change within the foreseeable future, the trial court had to determine whether termination of parental rights was in the best interests of the children. K.S.A. 2017 Supp. 38-2269(g). The trial court must accord "primary consideration to the physical, mental and emotional health of the child." K.S.A. 2017 Supp. 38-2269(g)(1). "The [trial] court should weigh the benefits to the child in terminating the relationship with the parent, given the characteristics and duration of the unfitness, against the emotional trauma to the child that may result from that termination and the removal of the parent from his or her life." *In the Interests of D.C.-R.*, No. 118,218, 2018 WL 1659794, at *3 (Kan. App. 2018) (unpublished opinion) (citing *In re K.R.*, 43 Kan. App. 2d 891, 904, 233 P.3d 746 [2010]).

The trial court's determination that the termination of a person's parental rights is in the best interests of the child is based on a preponderance of the evidence and is made within the trial court's sound discretion. *In re R.S.*, 50 Kan. App. 2d 1105, 1115-16, 336

17

P.3d 903 (2014). We review the trial court's decision for an abuse of discretion. *In re Marriage of Rayman*, 273 Kan. 996, 999, 47 P.3d 413 (2002). A trial court abuses its discretion if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

The trial court determined that it was in the best interests of the children to terminate M.C.'s parental rights. The trial court stated:

"These are all young children. They deserve to know what permanency looks like. They do not deserve to have to wait and see if or when their mother will be or ever can be a permanency option for them. They are in a relative placement that is an adoptive resource, and are doing very well in that placement."

The children are very young and have not been in their mother's custody since November 2015. M.C. claims that she loves her children and while that is likely true,

"A parent may be labeled 'unfit' under the law even though he or she loves the child and wants to do the right thing, which may be the case here. But we must judge these cases based mostly upon actions, not intentions, and we must keep in mind that a child deserves to have some final resolution within a time frame that is appropriate from that child's sense of time." *In the Interest of J.A.D.*, No. 117,693, 2018 WL 1885253, at *7 (Kan. App. 2018) (unpublished opinion) (citing *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 [2008]).

The children have been in their maternal grandmother's custody and care and are thriving under that care. The children stopped crying when they leave visitations with their

mother, which may evidence a weakening of the bond the children have toward M.C. While this alone does not necessarily evidence a total lack of a bond, the record does not support M.C.'s contention that no reasonable judicial officer would terminate her parental rights.

Given M.C.'s substance abuse problems, association with drug users and sellers, lack of employment or sufficient income, lack of suitable housing, and failure to provide evidence of likely change, we are unable to conclude that no reasonable judicial officer would terminate M.C.'s parental rights. As a result, we find no error in the trial court's decision to terminate M.C.'s parental rights.

Affirmed.